IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| 3XA WIRELESS, INC., an Illinois corporation, and MOGO WIRELESS, INC., a Georgia corporation, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 08 CV 2867 |
| WILSON ELECTRONICS, INC., a Utah corporation, | ) ) ) ) | (JURY TRIAL DEMANDED) Judge Dow |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

Plaintiffs, 3XA WIRELESS, INC. ("3XA") and MOGO WIRELESS, INC. ("Mogo") (collectively "3XA and Mogo" or "Plaintiffs"), by and through their attorneys, MOMKUS McCLUSKEY LLC, submit this Memorandum of Law in Support of their Motion for a Temporary Restraining Order and Preliminary Injunction against Defendant, WILSON ELECTRONICS, INC. ("Wilson" or "Defendant").

## FACTS

In support of this Memorandum, attached hereto as Exhibits A and B are the Declarations of Tim Avicola and Mark Eckhardt..

As more fully set forth in Plaintiffs' Complaint, Plaintiff, 3XA is the developer of an easy-to-install, affordable, uni-directional dual-band wireless cellular signal amplifier that plugs into a car's cigarette lighter.  3XA also developed a model that plugs into a computer's USB port. 3XA licensed the technology to Plaintiff, Mogo, for manufacture and distribution of the products (hereinafter, "3XA/Mogo product").

Testing by numerous organizations, including but not limited to Best Buy, RadioShack, the Federal Bureau of Investigation, the Georgia Highway Patrol, and the United States Postal Service, has shown that 3XA's design improves cell phone performance by increasing signal strength, reducing dropped calls and improving call clarity.

Defendant, Wilson, is an active competitor of Plaintiffs, in that it manufactures and sells its own wireless cellular amplifiers, antennas and accessories for use with cellular telephones.

During a wireless trade show in Las Vegas, Nevada which ran from April 1 through April 3, 2008, Defendant, Wilson, widely distributed what it labeled a "CONSUMER ALERT" (hereinafter, "First Known Consumer Alert"), in which Defendant boldly declared that the 3XA/Mogo product was a "FAKE" and a "FRAUD" under the guise of "protecting the public." The First Known Consumer Alert furthermore asserted that the 3XA/Mogo product "negatively impacts the performance of a cell phone," "fools the user," "is not properly designed," that it causes the phone to reduce output power to the cell site "which results in no connection between the phone and the cell site," that it can "harm" cell phone performance, and that the product "hurts the public" and is a "detriment to public safety." A true and accurate copy of the First Known Consumer Alert is attached hereto and made a part hereof as Exhibit C.

In addition to widely disseminating the First Known Consumer Alert to guests and participants at the CTIA Wireless Trade Show, Wilson specially delivered it to nationwide distribution firms, retailers, Mogo customers and distributors, and prospective customers and distributors, including but not limited to Best Buy, Sams/Wal-Mart, DAS, and RadioShack

Subsequently, Defendant, Wilson, issued a second "CONSUMER ALERT" (hereafter, "Second Known Consumer Alert"), which was identical in substance to the First Known Consumer Alert that was distributed at the Las Vegas, Nevada wireless trade show. While the

Second Known Consumer Alert removed the all-capitalized, large-font word "FAKE" repeated at the top of the first document, used a different image of the product, and removed the prohibitory sign ("⊘") from overtop the product image, the substantive text of the Second Known Consumer Alert was identical to that of the first. A true and accurate copy of the Second Known Consumer Alert is attached hereto and made a part hereof as Exhibit D.

Wilson distributed this Second Known Consumer Alert to distribution firms, retailers, Mogo customers and distributors, and prospective customers and distributors, including Best Buy, Sams/Wal-Mart, DAS, and RadioShack.

These advertising and promotional claims (both the First and Second Known Consumer Alerts (hereinafter, "Consumer Alerts")) are and were both false and misleading to consumers, in that field testing has established that cell phone performance can be improved a great deal by amplifying only the downlink path (uni-directional amplification) and in most cases, when used correctly the 3XA/Mogo product improved the performance of the cell phone to the point where signal bar indicators consistently increased, dropped calls were reduced and call clarity reception was improved.

Defendant's false promotion and advertising, under the guise of a "Consumer Alert," is material to distributors', retailers', and consumers' decisions, and is intended by Defendant to induce distributors and retailers to sell and distribute, and consumers to purchase, Wilson's own mobile wireless cellular amplifiers, antennas and accessories, rather than other competing products, and specifically, rather than the 3XA/Mogo product.

Amongst other damages, Wilson's consumer alerts have resulted in delay and/or cancelation of anticipated preliminary sales in excess of $1,000,000.00 from anticipated orders of at least 19,300 units from retailers and distributors, including but not limited to

DAS, Best Buy, Wal-Mart and RadioShack and the loss of profits and/or royalty fees associated therewith, and loss of profits and/or royalty fees associated with anticipated subsequent and continuing orders from the various retailers and distributors. Furthermore, the Consumer Alerts have caused immeasurable damage to Plaintiffs' reputations and good will.

In spite of Wilson's above-described conduct, on or about March 27, 2008, Wilson filed suit against 3XA and MOGO in the United States District Court, Central District of Utah, in what 3XA and MOGO believe was a calculated pre-emptive action, in anticipation of 3XA's and MOGO's reactions to Wilson's release and distribution of the Consumer Alerts, to attempt to have any disputes arising from the Consumer Alerts heard in Utah, Wilson's home state.   Wilson's Utah Complaint alleged False Advertising under the Lanham Act and violation of Utah's state Truth in Advertising statute.

On May 16, 2008, the day upon which 3XA and MOGO were required to answer or otherwise plead in the Utah action, 3XA and MOGO filed a Motion to Dismiss the Utah action under Rules 12(b)(2) and 12(b)(6), primarily based upon want of jurisdiction in Utah.

Contemporaneously therewith, 3XA and MOGO filed the instant complaint against Wilson, arising from the Consumer Alerts, and asserting the following causes of action: False Advertising under the Lanham Act (15 U.S.C. § 1125(a))(Count I), Violation of the Illinois Uniform Deceptive Practices Act (815 ILCS § 510/1 *et. seq.*)(Count II); Illinois Common Law Disparagement of Goods and Services (Count III); Illinois Common Law Defamation *Per Se* (Count IV); Illinois Common Law Defamation *Per Quod* (Count V); Illinois Common Law False Light (Count VI); and, Illinois Common Law Tortious Interference with Prospective Business Advantage and Relationships (Count VII).

Shortly after 3XA and MOGO learned of Wilson's distribution of the Consumer Alerts and were served with Wilson's Utah complaint, but before the May 16, 2008, date upon which 3XA and MOGO were required to answer or otherwise plead in the Utah action, 3XA and MOGO through their counsel apprised Wilson's Utah counsel of the Consumer Alerts, and immediately thereafter, on Plaintiffs' information and belief, distribution of the alerts ceased.

Thereafter, in late May, the parties agreed in principle in the Utah action to conduct limited and expedited discovery on the issue of jurisdiction (a formal stipulation was filed with the Utah Court in early June, 2008), and in the Illinois action, on June 5, 2008, it was agreed in principle that Wilson would waive service, appear and answer or otherwise plead within 60 days after June 5, 2008, or by August 4, 2008[1]. (Wilson executed the formal waiver of service on June 12, 2008).

Shortly thereafter, on or about June 17, 2008, Wilson issued its expedited Interrogatories and Production Requests limited to jurisdictional issues, to be answered within 14 days, by July 1, 2008. 3XA and MOGO provided their answers to the Utah expedited written discovery on or about July 1, 2008, and on the following day, through counsel, spoke with Wilson's Utah counsel about the parties' expressed desires to explore a global settlement at that point, amongst other reasons to potentially avoid the costs and fees associated with substantial and additional work that would be necessitated by continuing forward with both pieces of litigation. At this point, it was agreed, in good faith, that 3XA and MOGO would transmit to Wilson a demand setting forth terms that would be acceptable to them in a global settlement of both cases, Wilson would review 3XA's and MOGO's proposal, and Wilson would then submit to 3XA and MOGO

---

[1] In counting out the days, 3XA's and MOGO's counsel arrived at August 5, 2008 and referenced this in communications with Wilson's counsel, and therefore, agreed not to default Wilson or otherwise object to a failure on Wilson's part to appear and answer on August 4, 2008, so long as they appeared and answered by August 5, 2008.

terms that would be acceptable to Wilson.

During the period from when 3XA and MOGO, through their counsel, apprised Wilson's Utah counsel of the Consumer Alerts, through the agreement to explore settlement on July 2, 2008, no further distribution of the Consumer Alerts occurred on the part of Wilson to 3XA's and MOGO's knowledge and belief.

Consistent with the parties' agreement, on July 7, 2008, 3XA and MOGO transmitted to Wilson terms that would be acceptable to them to globally resolve the parties' disputes. Despite that 3XA and MOGO transmitted their demand to Wilson only 5 days after the agreement to explore settlement was reached, a response from Wilson was not immediately forthcoming. Finally, on July 30, 2008, following inquiry, Wilson, through its counsel, indicated that Wilson had been preparing a response, which was going to be sent over "shortly."

During the period from when the agreement to exchange settlement terms was reached on or about July 2, 2008, through Wilson's indication on July 30, 2008 that its "response" would be sent "shortly," no further distribution of the Consumer Alerts occurred to 3XA's and MOGO's knowledge and belief.

Two days later, on August 1, 2008, Wilson requested a 15 day extension to appear and answer or otherwise plead in the instant Illinois case. However, also on August 1, 2008, 3XA and MOGO learned that a copy of the First Known Consumer Alert was transmitted that same day from DAS, a distributor, to Phoenix, another but larger nationwide distributor.

In response to both, on Monday August 4, 2008, 3XA and MOGO offered to agree to such an extension, as long as (1) Wilson was willing and able to confirm that it had no involvement, either directly or indirectly, in the transmission of the First Known Consumer Alert from DAS to Phoenix; and, (2) Wilson would agree, whether or not it ultimately decided to file a

motion to stay these proceedings during the pendency of the Utah motion (something Wilson had previously suggested it intended to do), to file an answer to the Complaint, herein, on the extended deadline.

The next day, August 5, 2008, Wilson stated it would not agree to either of the conditions suggested in connection with the proposed 15 day continuance, and instead, filed its appearance and Answer to the Complaint herein.

The obvious inference in Wilson's refusal to confirm it had no involvement, either directly or indirectly, in the transmission of the First Known Consumer Alert from DAS to Phoenix, is that in fact, even during this "good faith" negotiation period, Wilson had involvement in circulating the Consumer Alert.

Furthermore, in filing its Answer, herein, on August 5, 2008, Wilson for the first time has admitted that it distributed copies of the First Known Consumer Alert both prior to and at the 2008 CTIA Wireless Trade Show in Las Vegas and distributed it to various distributors and retailers, including Radio Shack and DAS. Wilson further admits that it issued the Second Known Consumer Alert and that it distributed it to various distributors and retailers, including Radio Shack and DAS.

The affirmative matters raised in Wilson's answer essentially assert that it believes that the statements made in its Consumer Alerts are true, and therefore, Wilson has every right to circulate the Alerts whenever it wants to whomever it wants (see, e.g., paras. 49 and 51).

Nonetheless, Wilson has pled "insufficient knowledge" in response to 3XA's and MOGO's allegations that:

- Testing by numerous organizations, including but not limited to Best Buy, RadioShack, the Federal Bureau of Investigation, the Georgia Highway Patrol, and the United States Postal Service, has shown that 3XA's design improves cell phone performance by increasing signal strength, reducing dropped calls and improving call clarity (para. 10);

7

- Field testing shows that cell phone performance can be improved a great deal by amplifying only the downlink path (uni-directional amplification) and in most cases, when used correctly the 3XA/Mogo product consistently increased signal bar indicators, reduced dropped calls and improved call clarity reception (para. 27);

- In the majority of areas where cell phones, on their own, showed zero bars or only one bar of signal strength, cell phones using the 3XA/Mogo product consistently showed three to five bars of signal strength (para. 28); and,

- In a test area where dropped calls were recorded on cell phones without use of the 3XA/Mogo product, no dropped calls occurred with use of the 3XA/Mogo product (para. 29).

Furthermore, while Wilson affirmatively asserted in response to paragraph 30 of the Complaint that it "denies that the 3XA/MOGO product significantly enhances call clarity on cell phones using the product," Wilson nonetheless pled insufficient knowledge in response to the allegations that:

- comparisons of sound quality in low receive signal areas between cell phones using the 3XA/Mogo product and those without, demonstrated significantly enhanced call clarity on the cell phones using the product. Visual examination of the audio files demonstrated considerable missing segments on the phones that were without benefit of the 3XA/Mogo product when compared to the phones that utilized the 3XA/Mogo product (para. 30).

There can be no question that if Wilson is willing to have a hand in further distributing the Consumer Alerts, either directly or indirectly, during a period of good faith negotiation, it will continue to distribute the Consumer Alerts until such time as they are ordered to cease.

As a result of these facts and circumstances, 3XA and MOGO respectfully request entry of a temporary restraining order and preliminary injunction, preventing Wilson from circulating these false promotions and advertisements intended to harm Plaintiffs, and which have resulted in harm to the Plaintiffs and will continue to harm Plaintiffs in the future without Court intervention.

### ARGUMENT

**PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND TO PRELIMINARY INJUNCTIVE RELIEF**

On the facts alleged in the Complaint, and the law applicable to those facts, Plaintiff has established a *prima facie* case for granting a preliminary injunction. Under Rule 65 of the Federal Rules of Civil Procedure, this Court may enter an order granting a preliminary injunction if Plaintiff shows:

    (1) That it stands a reasonable likelihood of success on the merits;

    (2) That it has no adequate remedy at law;

    (3) That it will suffer irreparable harm without injunctive relief;

    (4) That the irreparable harm it will suffer absent injunctive relief outweighs the irreparable harm Defendant will suffer if the injunctive relief is granted; and

    (5) That the injunctive relief will not disserve the public interest.

Baja Contractors, Inc. v. City of Chicago, 830 F.2d 667, 675 (7th Cir., 1987); Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir., 1984).

**1.    Plaintiffs Stand a Reasonable Likelihood of Success on the Merits.**

For purposes of a likelihood of success on the merits, "the threshold is low. It is enough that 'the plaintiff's chances are better than negligible . . ..'" Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 387 (7th Cir., 1984).

As noted, Plaintiffs have filed claims against Defendant sounding in: False Advertising under the Lanham Act (15 U.S.C. § 1125(a))(Count I), Violation of the Illinois Uniform Deceptive Practices Act (815 ILCS § 510/1 *et. seq.*)(Count II); Illinois Common Law Disparagement of Goods and Services (Count III); Illinois Common Law Defamation *Per Se*

(Count IV); Illinois Common Law Defamation *Per Quod* (Count V); Illinois Common Law False Light (Count VI); and, Illinois Common Law Tortious Interference with Prospective Business Advantage and Relationships (Count VII). The facts and circumstances of this case establish likelihood of success on all claims.

## A.    FALSE ADVERTISING.

15 U.S.C. § 1125(a) provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Here, there can be little question that the Consumer Alerts contain false and misleading representations that were designed and are likely to cause confusion, mistake, and to deceive, and that these statements misrepresent the nature, characteristics and qualities of 3XA's and MOGO's goods, services, and commercial activities. This would include statements, such as that the 3XA/Mogo product is a "fake," that the 3XA/Mogo product is a "fraud," that the 3XA/Mogo product "negatively impacts the performance of a cell phone," that the 3XA/Mogo product "fools the user," that the 3XA/Mogo product "is not properly designed," that the 3XA/Mogo product causes the phone to reduce output power to the cell site "which results in no connection between the phone and the cell site," that the 3XA/Mogo product can "harm" cell

phone performance, that the 3XA/Mogo product "hurts the public," and that the 3XA/Mogo product is a "detriment to public safety."

These statements are particularly egregious in light of Defendant's pled "insufficient knowledge" with respect not only to what 3XA and MOGOs field testing showed, but also the field testing performed by Best Buy, RadioShack, the Federal Bureau of Investigation, the Georgia Highway Patrol, and the United States Postal Service, amongst others.

Indeed, just the manner in which Wilson put together its releases is misleading, likely to cause confusion and mistake, and likely to deceive, inasmuch as the "CONSUMER ALERTS" were designed to appear as if they were either some form of official warning or a restatement of an official warning coming from a governmental or non-profit public-interest organization.

Further, Plaintiffs have alleged specific damages, amongst other damages, in asserting that Wilson's consumer alerts resulted in delay and/or cancelation of anticipated preliminary sales in excess of $1,000,000.00 from anticipated orders of at least 19,300 units from retailers and distributors, including but not limited to DAS, Best Buy, Wal-Mart and RadioShack and the loss of profits and/or royalty fees associated therewith, and loss of profits and/or royalty fees associated with anticipated subsequent and continuing orders from the various retailers and distributors. In support of these damages, Wilson, in its Answer, has admitted that it distributed the Consumer Alerts to various distributors and retailers, including Radio Shack and DAS.

Finally, 15 U.S.C. § 1125(a) has wide application, inasmuch as liability can attach even where there is no known current damage where there is a likelihood of damage to a plaintiff in the future as a result of the act.

As such, Plaintiffs have a likelihood of succeeding on the merits in Count I.

### B.    VIOLATIONS OF THE ILLINOIS UNIFORM DECEPTIVE PRACTICES ACT.

The Illinois Uniform Deceptive Practices Act, 815 ILCS §510/1 *et seq*., defines a "Deceptive Trade Practice" in pertinent part as follows:

(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

> . . . (4) uses deceptive representations or designations of geographic origin in connection with goods or services; . . .

> (8) disparages the goods, services, or business of another by false or misleading representation of fact; . . .

> (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding. 815 ILCS §510/2(a).

Section 2 of the Act further provides: "In order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding." 815 ILCS §510/2(b).

For the same reasons espoused above relative to the False Advertising claim, Plaintiffs have a likelihood of succeeding on the merits of their Illinois Uniform Deceptive Practices Act claim in Count II, as well.

### C.    COMMON LAW DISPARAGEMENT OF GOODS AND SERVICES.

A cause of action for commercial disparagement lies where a Defendant makes false and demeaning statements regarding the quality of another's goods and services. Appraisers Coalition v. Appraisal Institute, 845 F.Supp. 592, 610 (N.D.Ill.1994).

Here, there can be no question that the statements contained in the Consumer Alerts regard the quality of the 3XA/MOGO product (i.e., their goods and services). Additionally, for the same reasons previously espoused, the delineated statements are both false and demeaning,

and Wilson's disparagement of the 3XA/MOGO product has resulted in damages.

As such, Plaintiffs also have a likelihood of succeeding on the merits of their Disparagement of Goods and Services claim in Count III.

### D.    DEFAMATION *PER SE*.

Under Illinois common law, a statement is defamatory if it "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with [him]." Bryson v. News America Publications, Inc., 174 Ill.2d 77, 87 (1996).

To succeed on a defamation claim, a plaintiff must establish that a defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of the statement to a third party, and that the publication caused damages. Seith v. Chicago Sun-Times, Inc., 371 Ill.App.3d 124, 134 (2007).

Where a plaintiff alleges defamation *per se*, he need not plead or prove actual damages. Bryson, 174 Ill.2d at 87.

In Illinois, five categories of statements are considered defamatory per se: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those that prejudice a party or impute lack of ability in the party's trade, profession, or business; and (5) those imputing adultery or fornication. Bryson, 174 Ill.2d at 88-89.

For the reasons previously espoused, there is a likelihood that Plaintiffs will succeed in establishing that the statements contained in the Consumer Alerts were false.

Further, there can be no question both that the statements in the Consumer Alerts impute

to Plaintiffs an inability to perform or want of integrity in the discharge of duties of office or employment, and also constitute statements that prejudice the Plaintiffs, and impute lack of ability, in their trade, profession or business.

Additionally, there is no dispute that Wilson published the statements to third-parties. The question thus becomes whether such publication was privileged.

Initially, an otherwise defamatory statement may enjoy constitutional "free speech" protection. Nonetheless, the test for determining whether a statement is protected from defamation claims under the first amendment is whether it can reasonably be interpreted as stating actual fact. In applying this test, courts are guided by several criteria: (1) whether the statement has a precise and readily understood meaning, (2) whether the statement is verifiable, and (3) whether the statement's literary or social context signals that it has factual content. Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc., 227 Ill.2d 381, 398 (2008).

Here, those factors all favor Plaintiffs. The statements utilized by Defendant have quite precise and readily understood meanings, particularly the terms "fake," "fraud," and "detriment to public safety." The statements are furthermore verifiable, or at the various least, a reasonable reader might interpret the Consumer Alerts as stating actual facts about 3XA and MOGO and their integrity and ability to perform in the discharge of duties of office or employment and in their trade, profession or business. See, Imperial Apparel, supra. Finally, the literary and/or social context of the statements, i.e., in the form of a quasi-official-looking "consumer alert" purportedly designed to protect the public and ensure public safety, signals to the reader that they have factual content.

In addition to First Amendment constraints, Illinois Law recognizes both absolute and qualified privileges to otherwise defamatory speech. However, "[t]he class of occasions where

defamatory statements are absolutely privileged is narrow and generally limited to legislative, judicial, and some quasi-judicial proceedings." Zych v. Tucker, 363 Ill.App.3d 831, 834 (1st Dist. 2006). Clearly no such privilege existed here.

Qualified privileges have been found to exist where all of the following elements have been present: (1) good faith by the defendant in making the statement; (2) an interest or duty to uphold; (3) a statement limited in its scope to that purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only." Id. Here, despite that Wilson's "Consumer Alerts" were distributed under the guise of protecting the public, they were not disseminated to the public, and instead, were distributed only to companies that might consider distributing or placing the 3XA/MOGO product for sale. If Wilson was truly concerned with protecting the public, it would have released its "Consumer Alerts" nationally. As such, there is a likelihood that Plaintiffs will succeed in establishing that there was no good faith in making the statements, no interest or duty to uphold, no limitation in scope or purpose, no proper occasion, no publication in a proper manner to proper parties only, and therefore, no qualified privilege.

Even if a qualified privilege might arguably be found to exist here, such a privilege "is defeated in circumstances where 1) false statements are made with malice or a reckless disregard for their truth, 2) the statements are not limited in scope, or 3) publication is not limited to proper parties." Id., at 834-35. Thus, here, there is a likelihood that if a qualified privilege was established, it would be defeated to the extent that Wilson acted with malice and a reckless disregard for the truth of the statements (as supported by the "insufficient knowledge" responses to the allegations of the Complaint), the statements were not limited in scope, and the publication was not to proper parties (i.e., if they truly believed the 3XA/MOGO product was a detriment to public safety and truly intended to protect the public, they would have published the Consumer

Alerts to the public).

Finally, because Plaintiffs assert Defamation *Per Se* in Count IV, actual damages are not necessary, despite that Plaintiffs have nonetheless pled actual damages in the form of injury to their professional reputations and other damages, including but not limited to delay and/or cancelation of anticipated preliminary sales in excess of $1,000,000.00 from anticipated orders of at least 19,300 units from retailers and distributors, including but not limited to DAS, Best Buy, Wal-Mart and RadioShack and the loss of profits and/or royalty fees associated therewith, loss of profits and/or royalty fees associated with anticipated subsequent and continuing orders from the various retailers and distributors, other lost profits, loss of good will, and other compensatory and consequential damages.

Again, these losses are supported by Wilson's admissions in its Answer that it distributed the Consumer Alerts to various distributors and retailers, including Radio Shack and DAS.

As such, Plaintiffs have a likelihood of succeeding on the merits of their Defamation *Per Se* claim in Count IV, as well.

### E.    DEFAMATION *PER QUOD*.

The difference between Defamation *Per Se* and Defamation *Per Quod*, is that in the latter, unlike the former, actual damages must be pled and proven.

For the reasons stated above, Plaintiffs have a likelihood of succeeding in establishing defamation, and given Wilson's admissions in its Answer that it distributed the Consumer Alerts to various distributors and retailers, including Radio Shack and DAS, have a likelihood of establishing actual damages.

As such, Plaintiffs have a likelihood of succeeding on the merits of their Defamation *Per*

*Quod* claim in Count V, as well.

### F.    FALSE LIGHT.

In order to establish a false light invasion of privacy, Plaintiffs must prove that (1) Plaintiffs were placed in a false light before the public as a result of Defendant's actions; (2) the false light in which Plaintiffs were placed would be highly offensive to a reasonable person; and (3) that Defendant acted with knowledge or reckless disregard for whether the statements it made were true or false. Kolegas v. Heftel Broadcasting Corp., 154 Ill.2d 1, 17, 607 N.E.2d 201, 209 (Ill., 1992).

For the reasons previously espoused, there is a likelihood that Plaintiffs will succeed in establishing that they were placed in a false light before the public as a result of Wilson's distribution of the Consumer Alerts.

Further, the false light into which Defendant's actions and statements have placed 3XA and Mogo, would be highly offensive to a reasonable person, in that being falsely accused of developing and/or selling a "fake" or "fraudulent" product that negatively impacts the very product it is intended to enhance, "fools" the consumer, "tricks" the phone, "harms" phone performance, "hurts the public," "is a detriment to public safety," performs poorly, and has no value, would be highly offensive to a reasonable person.

Finally, whether or not Wilson knew the statements made in the Consumer Alerts were false, there can be no question, in light of their "insufficient knowledge" pleadings that they were made with reckless disregard to their truth or falsity.

As such, Plaintiffs have a likelihood of succeeding on the merits of their False Light claim in Count VI, as well.

### G.    TORTIOUS    INTERFERENCE    WITH    PROSPECTIVE BUSINESS ADVANTAGE AND RELATIONSHIPS.

Finally, in order to establish tortious interference with prospective business advantage and relationships, Plaintiffs must prove that (1) they had a reasonable expectancy of entering into a valid business relationship, (2) Defendant knew of this expectancy, (3) Defendant intentionally and unjustifiably interfered and induced or caused a breach or termination of the expectancy, and (4) damage to Plaintiffs resulting from Defendant's interference. A J Kikson v. Underwriters Laboratories, Inc., 492 F.3d 794, 800 (7th Cir., 2007).

As the Complaint alleged, prior to the time the First and Second Known Consumer Alerts were circulated, Plaintiffs were engaged in discussions with certain distributors and retailers, including, but not limited to, DAS, Best Buy, Wal-Mart, and RadioShack, concerning the distribution and sale of the 3XA/Mogo product.  Many such distributors and retailers indicated an intent to distribute or sell the 3XA/Mogo product. Based upon the distributors and retailers voiced interest and intention to sell and/or distribute the 3XA/MOGO product, 3XA and Mogo had a reasonable expectation of entering into valid business relationships with the distributors and retailers.

Defendant knew of Plaintiffs discussions with these distributors and retailers and of Plaintiffs' expectancies to enter into business relationships with them, and nonetheless intentionally interfered with these relationships by distributing the Consumer Alerts, admittedly to distributors and retailers, and admittedly to at least DAS and RadioShack.

As a result and as pled, 3XA and Mogo suffered damages, including but not limited to delay and/or cancelation of anticipated preliminary sales in excess of $1,000,000.00 from anticipated orders of at least 19,300 units from retailers and distributors, including but not limited to DAS, Best Buy, Wal-Mart and RadioShack and the loss of profits and/or royalty

fees associated therewith, loss of profits and/or royalty fees associated with anticipated subsequent and continuing orders from the various retailers and distributors, other lost profits, loss of good will, damage to reputation, and other compensatory and consequential damages.

For these reasons, Plaintiffs have a likelihood of succeeding on the merits of their Tortious Interference claim in Count VII, as well.

2.    **Plaintiffs Have No Adequate Remedy at Law and Will Suffer Irreparable Harm if They Are Not Granted Injunctive Relief.**

A damages remedy can be inadequate for any of four reasons: (1) the damage award may come too late to save plaintiff's business; (2) the plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy; (3) damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected; or, (4) the nature of plaintiff's loss may make damages very difficult to calculate. Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir., 1984).

As alleged in the complaint, 3XA and Mogo are relatively new companies, and the technological approach behind their products is likewise, relatively new technology. Meanwhile, Wilson, touts itself as being a leader in the wireless communications industry for over 40 years. Wilson has a history, as a leading electronics manufacturer, of attempting to run its start-up competitors out of the market. As such, a damage award may come too late to save Plaintiffs' business and Plaintiffs may not be able to finance this lawsuit against Wilson without the revenues from their business that Wilson is attempting to destroy.

Furthermore, the nature of plaintiff's loss may make damages very difficult to calculate. 3XA and Mogo will likely never know the full extent of the damage caused by Wilson's actions.

They will likely never determine everyone who ended up seeing the Consumer Alerts and acting on them. While Wilson should be able to identify everyone to whom it circulated the alerts, the exponential further distribution, i.e., to whom those individuals then turned around and provided the document, to whom that next set of individuals then turned around and provided the document, and so on, will never be known. With the inability to determine everyone to whom the Consumer Alerts were published comes the inability to determine what actions or inactions occurred as a result of the publications, i.e., the full extent of individuals and entities choosing not to purchase or distribute the 3XA/Mogo product. Also, the disparagement and false statements contained in Defendant's Consumer Alerts are causing permanent and irreparable damage to Plaintiffs' reputation and goodwill. It is difficult to calculate the true value of a loss of goodwill or reputation. Promotek Industries, Inc., 300 F.3d at 813.

Additionally, for purposes of establishing a right to injunctive relief, "[i]rreparable harm does not mean injury that is beyond repair nor beyond compensation in damages. Rather it denotes transgressions of a continuing nature." SSA Foods, Inc. v. Giannotti, 105 Ill.App.3d 424, 428 (1st Dist. 1982). Plaintiffs require equitable relief, here, as the harm will be ongoing if Wilson is permitted to continue its smear campaign, possibly resulting in the end of Plaintiffs' business, and the nature of Plaintiffs' loss makes damages difficult to calculate. Also, it is a well established presumption that injuries arising from Lanham Act violations are irreparable, and hence, have no legal remedy. Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 16 (7th Cir., 1992); Promatek Industries, Ltd. v. Equitrac Corp., 300 F.3d 808, 813 (7th Cir., 2002).

Finally, "[t]he requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief." Roland

Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir., 1984).  Here, there is no question that Plaintiffs cannot wait until the end of trial to obtain relief.  The trial of this matter could potentially be several years out, and in the meantime, if Defendant is permitted to continue with its wrongful smear campaign, Plaintiffs could very well be driven out of business by that time.

As such, both the "inadequate remedy at law" and "irreparable injury" factors are met in this case.

**3.     The Irreparable Harm that Plaintiffs Will Suffer if Injunctive Relief is Not Granted Outweighs the Irreparable Harm that Defendant Will Suffer if it is Granted.**

Defendant will suffer no irreparable harm as a result of a preliminary injunction ordering it to halt distribution of the Consumer Alerts and similar materials. The purpose of the Consumer Alerts is only to disparage and damage 3XA, Mogo, and their product. Arguably, the ultimate purpose is to drive these upstart, lawful competitors out of the marketplace. Lawful competition between Plaintiffs and Defendant is the *status quo*.  Aside from potentially losing sales of antennae to a more cost-effective and consumer-friendly product through lawful competition, Defendant's business and the sale of its products will not be affected by an order compelling it to cease distributing the materials in question.

Alternatively, if Defendant is permitted to continue to distribute these false and harmful assertions concerning Plaintiffs and their product during the pendency of the litigation, there can be no question that Plaintiffs will suffer extensive further irreparable harm and damage to their reputations, goodwill, and existing and potential relationships with customers.

Thus, weighing the harm of enjoining versus not enjoining, also clearly falls in favor of the Plaintiffs.

4.      **Public Interest Weighs in Favor of Plaintiffs.**

While Defendant will undoubtedly argue that the precise reason it has chosen to disparage Plaintiffs and their product in the form of these Consumer Alerts was to serve the public interest, this Court should not be so fooled. As noted previously, the public has not been the recipients of the Alerts. Rather, the Alerts have been carefully disseminated only to retailers and distributors who do or might sell or distribute Plaintiffs' product in competition with Defendant.

Indeed, consumers and the public interest are both served through lawful, fair and free trade and competition, which is one of the principal public policies upon which this country was founded. This is precisely what Plaintiffs seek by way of injunctive relief: lawful, fair and free trade.

Moreover, the correct standard when examining the effect of granting a preliminary injunction is not whether public interest will be served by the granting of the preliminary injunction, but rather whether the public interest will be *disserved*. Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc., 698 F.2d 862, 868 (7th Cir., 1983).

Here, the public interest will in no way be harmed by enjoining Defendant from distributing so-called Consumer Alerts that contain false and misleading information concerning Plaintiffs' product. Public interest will only be advanced by prohibiting Defendant's unlawful conduct during the pendency of this litigation. Consumers and the public interest are both disserved by the dissemination of disinformation designed to steer them away from new, cost-effective and consumer-friendly products.

Finally, to the extent that Defendant would argue that the injunction being sought is a restraint on future speech, while restraints on future speech are not favored under the law, such

restraints have been imposed in numerous cases. *See e.g. U.S. v. Raymond*, 228 F.3d 804, 807 (7th Cir., 2000) (enjoining "false or misleading commercial speech" ads and a book relating to a tax scheme); *International Profit Associates, Inc. v. Paisola*, 461 F.Supp.2d 672, 679 (N.D.Ill., 2006) (granting a temporary restraining order to restrain defendants from posting certain information on its website that was demonstrably false and defamatory, and stating "it does not violate the principles of the First Amendment to enjoin defendants from continuing to include certain information on their website that is . . . demonstrably false and defamatory."); *Huskey v. National Broadcasting Company, Inc.*, 632 F.Supp. 1282, 1295 (N.D.Ill., 1986) (holding that injunctive relief prohibiting distribution of prisoner engaged in "private activities" was not improper where prisoner had not consented to distribution and stating that "the First Amendment thus offers no protection to those who publish private or defamatory matter, [therefore] it goes without saying there is no prior restraint limitation as to remedy.").

For example, in <u>Streif v. Bovinette</u>, 88 Ill.App. 3d 1079 (5th Dist. 1980), the plaintiff sought to enjoin the defendant from what was alleged to be a "pattern of continuing harassment" including unwarranted and ill-founded letters of complaint to various state and federal agencies, the majority of which were found to be without merit. While the appellate court reversed the granting of a preliminary injunction, it nonetheless did so solely on the basis that the circuit court's order of injunction lacked the specificity required by statute, and the case was therefore remanded for further proceedings.

The <u>Streif</u> court nonetheless acknowledged that "plaintiffs are entitled to be free from improper unjustified interference with their right to conduct a lawful business, which is a property right that equity may clearly intervene to protect." 88 Ill.App.3d at 1082. The court analogized the facts to cases dealing with tortious commercial disparagement in which restraints

23

on future speech have been permitted, despite that, in <u>Streif</u>, unlike herein, the defendant was not a competitor of Streif's business in a purely commercial context.

## CONCLUSION

Because Plaintiffs have met all of the specific requirements for the issuance of a preliminary injunction, for the reasons set forth herein, this Court should appropriately enjoin Defendant Wilson from further distributing the Consumer Alerts at issue and any similar documents, throughout the pendency of this case until the issue of a permanent injunction has been fully resolved.

Respectfully submitted,

Momkus McCluskey, LLC

By:_____/s/ Steven B. Ekker_____
        Steven B. Ekker

Steven B. Ekker
Momkus McCluskey LLC
1001 Warrenville Road, Suite 500
Lisle, Illinois 60532
630-434-0400
Attorneys for Plaintiff
Attorney No. 6216016
W:\1_20\1781.080183\Pleadings\Memo TRO.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| 3XA WIRELESS, INC., an Illinois corporation, and MOGO WIRELESS, INC., a Georgia corporation, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 08 CV 2867 |
| WILSON ELECTRONICS, INC., a Utah corporation, | ) ) ) | (JURY TRIAL DEMANDED) |
| Defendant. | ) ) | Judge Dow |

## <u>DECLARATION OF TIM AVICOLA</u>

Tim Avicola, hereby declares as follows:

1.      I am the President of 3XA Wireless, Inc., a plaintiff in this action.  The matters stated in this declaration are true and accurate to the best of my personal knowledge.  All statements made in this declaration are made under the penalties of perjury pursuant to 28 U.S.C. § 1746.

2.      3XA is an Illinois corporation with its principal place of business in Crystal Lake, Illinois.  3XA is the designer of a downlink only cellular enhancer, a device which boosts the receive signal from cellular towers.

3.      3XA's design has been tested by various organizations and has been noted to improve cell phone performance by increasing signal strength, reducing dropped calls and improving call clarity.  These organizations include Best Buy, RadioShack, the Federal Bureau of Investigation, the Georgia Highway Patrol, and the United States Postal Service.

4.      3XA is a relatively new company, and the technological approach behind its products is likewise, relatively new technology.

5.      During a wireless trade show in Las Vegas, Nevada which ran from April 1 through April 3, 2008, I learned that Wilson widely distributed what it labeled "CONSUMER

1


EXHIBIT
A

ALERT," a true and accurate copy of which is attached to Plaintiffs' Memorandum of Law in Support of their Motion for a Temporary Restraining Order and Preliminary Injunction, as Exhibit C.

6.      Both actual and prospective retailers and distributors of the 3XA/MOGO product, including but not limited to Best Buy, Sams/Wal-Mart, DAS, and RadioShack, questioned 3XA and MOGO about the efficacy of the 3XA/MOGO product, having received the first known Consumer Alert from Wilson.

7.      Shortly thereafter, I learned that Wilson subsequently issued a second "CONSUMER ALERT" which was identical in substance to the first, except that it removed the all-capitalized, large-font word "FAKE" repeated at the top of the first document, used a different image of the product, and removed the prohibitory sign ("$\varnothing$") from overtop the product image.  A true and accurate copy of this second Consumer Alert is attached to Plaintiffs' Memorandum of Law in Support of their Motion for a Temporary Restraining Order and Preliminary Injunction, as Exhibit D.

8.      Both actual and prospective retailers and distributors of the 3XA/MOGO product, including but not limited to Best Buy, Sams/Wal-Mart, DAS, and RadioShack, questioned 3XA and MOGO about the efficacy of the 3XA/MOGO product, having received the second known Consumer Alert from Wilson.

9.      The claims contained in the "Consumer Alerts" about the 3XA/MOGO product are false and misleading to consumers, in that field testing has established that cell phone performance can be improved a great deal by amplifying only the downlink path (uni-directional amplification) and in most cases, when used correctly the 3XA/Mogo product improved the performance of the cell phone to the point where signal bar indicators consistently increased, dropped calls were reduced and call clarity reception was improved.

10.     Prior to the time the Consumer Alerts were circulated, 3XA and MOGO were engaged in discussions with certain distributors and retailers, including, but not limited to, DAS, Best Buy, Wal-Mart, and RadioShack, concerning the distribution and sale of the 3XA/Mogo

product.

11.    Many such distributors and retailers demonstrated great interest in the 3XA/MOGO product and indicated an intent to distribute or sell the 3XA/Mogo product.

12.    Wilson's circulation of its Consumer Alerts, amongst other damages, has resulted in delay and/or cancelation of anticipated preliminary sales in excess of $1,000,000.00 from anticipated orders of at least 19,300 units from retailers and distributors, including but not limited to DAS, Best Buy, Wal-Mart and RadioShack, the loss of profits and/or royalty fees associated therewith, and loss of profits and/or royalty fees associated with anticipated subsequent and continuing orders from the various retailers and distributors.

13.    The Consumer Alerts have also caused immeasurable damage to 3XA's and MOGO's reputations and good will, and have resulted in substantial disruption of the lawful business of 3XA and MOGO and the sale and distribution of the 3XA/MOGO product.

14.    After Wilson's lawyers were notified of the existence of the Consumer Alerts and 3XA and MOGO subsequently filed the instant lawsuit, I did not learn of any further instances where the Consumer Alerts were distributed until being contacted by a distributor called Phoenix on August 1, 2008, having received a Consumer Alert via facsimile from DAS, another distributor.

15.    On August 4, 2008, during a period in which the parties were exploring settlement, 3XA and MOGO requested that in exchange for a 15 day extension for Wilson to file its Answer to the Complaint herein, that Wilson confirm it had no involvement, either directly or indirectly, in the transmission of the First Known Consumer Alert from DAS to Phoenix.

16.    Refusing, on the next day, August 5, 2008, Wilson filed its appearance and Answer to the Complaint herein admitting its distribution of both Consumer Alerts to retailers and distributors, including Radio Shack and DAS.

17.    The full nature and extent of damage caused to date by Wilson's Consumer Alerts is not completely known.

18.    Further dissemination of the Consumer Alerts or similar documents will have a

3

devastating effect on both 3XA and MOGO.

DATED this 11th day of August, 2008.

/s/ Tim Avicola

Steven B. Ekker
Momkus McCluskey LLC
1001 Warrenville Road, Suite 500
Lisle, Illinois 60532
630-434-0400
Attorneys for Plaintiffs
Attorney No. 6216016
W:\1_20\1781.080183\Pleadings\Declaration Tim Avicola.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| 3XA WIRELESS, INC., an Illinois corporation, and MOGO WIRELESS, INC., a Georgia corporation, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 08 CV 2867 |
| | ) | |
| WILSON ELECTRONICS, INC., a Utah corporation, | ) ) | (JURY TRIAL DEMANDED) |
| | ) | Judge Dow |
| Defendant. | ) | |

## <u>DECLARATION OF MARK ECKHART</u>

Mark Eckhart, hereby declares as follows:

1.      I am the President of Mogo Wireless, Inc., a plaintiff in this action.  The matters stated in this declaration are true and accurate to the best of my personal knowledge.  All statements made in this declaration are made under the penalties of perjury pursuant to 28 U.S.C. § 1746.

2.      Mogo is a Georgia corporation with its principal place of business in Atlanta, Georgia.  Mogo licenses the right to manufacture and distribute 3XA's downlink only cellular enhancer, a device which boosts the receive signal from cellular towers (the "3XA/MOGO Product").

3.      The "3XA/MOGO Product has been tested by various organizations and has been noted to improve cell phone performance by increasing signal strength, reducing dropped calls and improving call clarity.  These organizations include Best Buy, RadioShack, the Federal Bureau of Investigation, the Georgia Highway Patrol, and the United States Postal Service.

4.      MOGO is a relatively new company.

5.      During a wireless trade show in Las Vegas, Nevada which ran from April 1 through April 3, 2008, I learned that Wilson widely distributed what it labeled "CONSUMER


EXHIBIT
B

ALERT," a true and accurate copy of which is attached to Plaintiffs' Memorandum of Law in Support of their Motion for a Temporary Restraining Order and Preliminary Injunction, as Exhibit C.

6.      Both actual and prospective retailers and distributors of the 3XA/MOGO product, including but not limited to Best Buy, Sams/Wal-Mart, DAS, and RadioShack, questioned 3XA and MOGO about the efficacy of the 3XA/MOGO product, having received the first known Consumer Alert from Wilson.

7.      Shortly thereafter, I learned that Wilson subsequently issued a second "CONSUMER ALERT" which was identical in substance to the first, except that it removed the all-capitalized, large-font word "FAKE" repeated at the top of the first document, used a different image of the product, and removed the prohibitory sign ("⊘") from overtop the product image.  A true and accurate copy of this second Consumer Alert is attached to Plaintiffs' Memorandum of Law in Support of their Motion for a Temporary Restraining Order and Preliminary Injunction, as Exhibit D.

8.      Both actual and prospective retailers and distributors of the 3XA/MOGO product, including but not limited to Best Buy, Sams/Wal-Mart, DAS, and RadioShack, questioned 3XA and MOGO about the efficacy of the 3XA/MOGO product, having received the second known Consumer Alert from Wilson.

9.      The claims contained in the "Consumer Alerts" about the 3XA/MOGO product are false and misleading to consumers, in that field testing has established that cell phone performance can be improved a great deal by amplifying only the downlink path (uni-directional amplification) and in most cases, when used correctly the 3XA/Mogo product improved the performance of the cell phone to the point where signal bar indicators consistently increased, dropped calls were reduced and call clarity reception was improved.

10.     Prior to the time the Consumer Alerts were circulated, 3XA and MOGO were engaged in discussions with certain distributors and retailers, including, but not limited to, DAS, Best Buy, Wal-Mart, and RadioShack, concerning the distribution and sale of the 3XA/Mogo

product.

11.    Many such distributors and retailers demonstrated great interest in the 3XA/MOGO product and indicated an intent to distribute or sell the 3XA/Mogo product.

12.    Wilson's circulation of its Consumer Alerts, amongst other damages, has resulted in delay and/or cancelation of anticipated preliminary sales in excess of $1,000,000.00 from anticipated orders of at least 19,300 units from retailers and distributors, including but not limited to DAS, Best Buy, Wal-Mart and RadioShack, the loss of profits and/or royalty fees associated therewith, and loss of profits and/or royalty fees associated with anticipated subsequent and continuing orders from the various retailers and distributors.

13.    The Consumer Alerts have also caused immeasurable damage to 3XA's and MOGO's reputations and good will, and have resulted in substantial disruption of the lawful business of 3XA and MOGO and the sale and distribution of the 3XA/MOGO product.

14.    After Wilson's lawyers were notified of the existence of the Consumer Alerts and 3XA and MOGO subsequently filed the instant lawsuit, I did not learn of any further instances where the Consumer Alerts were distributed until being contacted by a distributor called Phoenix on August 1, 2008, having received a Consumer Alert via facsimile from DAS, another distributor.

15.    On August 4, 2008, during a period in which the parties were exploring settlement, 3XA and MOGO requested that in exchange for a 15 day extension for Wilson to file its Answer to the Complaint herein, that Wilson confirm it had no involvement, either directly or indirectly, in the transmission of the First Known Consumer Alert from DAS to Phoenix.

16.    Refusing, on the next day, August 5, 2008, Wilson filed its appearance and Answer to the Complaint herein admitting its distribution of both Consumer Alerts to retailers and distributors, including Radio Shack and DAS.

17.    The full nature and extent of damage caused to date by Wilson's Consumer Alerts is not completely known.

18.    Further dissemination of the Consumer Alerts or similar documents will have a

3

devastating effect on both 3XA and MOGO.

DATED this 11th day of August, 2008.

_____/s/ Mark Eckhart_____

Steven B. Ekker
Momkus McCluskey LLC
1001 Warrenville Road, Suite 500
Lisle, Illinois 60532
630-434-0400
Attorneys for Plaintiffs
Attorney No. 6216016
W:\1_20\1781.080183\Pleadings\Declaration Tim Avicola.doc

4

# CONSUMER ALERT



## Call Capture Personal Mobile Cell Tower
## (also known as the MOGO STIX or Cell Ranger)

The "MOGO STIX" Personal Mobile Cell Tower, by Call Capture, negatively impacts the performance of a cell phone. The Call Capture/MOGO fools the user. Its receive-only amplifier increases the bars on the cell phone (which only indicate received signal strength) and has no transmit amplification on the phone's power going to the cell site.

Unlike a properly designed bi-directional cellular booster, which utilizes both a transmit and a receive amplifier, the Call Capture/MOGO does not contain a transmit amplifier to boost the signal from the phone back to the cell site. The weak link in all cell systems is the low power from the phone to the cell site, whereas there is always more power available from the cell site to the phone. The Call Capture/MOGO, in its current form, is the equivalent of half a booster.

On CDMA systems, the amplified receive-only signal, supplied by the Call Capture/MOGO to the phone, tricks the phone into thinking that it is closer to the cell site than

it really is. When the phone thinks it is closer to the cell site, it reduces its output power to the cell site to conserve battery life, which results in no connection between the phone and cell site. In weak areas the Call Capture will cause both incoming and outgoing calls to be dropped. This could be disastrous in an emergency.

We at Wilson Electronics feel an obligation to alert the public to this fake and fraud, which can harm your cell phone's performance. Such a product hurts the public and is a detriment to public safety. It also conveys to the public the impression that all cellular signal amplifiers perform poorly and are of no value. We want consumers to know that cellular signal amplifiers work well when properly engineered.



**Wilson®**
*Electronics, Inc.*



**EXHIBIT**

C

# CONSUMER ALERT



## Call Capture Personal Mobile Cell Tower
## (also known as the MOGO STIX or Cell Ranger)

The "MOGO STIX" Personal Mobile Cell Tower, by Call Capture, negatively impacts the performance of a cell phone. The Call Capture/MOGO fools the user. Its receive-only amplifier increases the bars on the cell phone (which only indicate received signal strength) and has no transmit amplification on the phone's power going to the cell site.

Unlike a properly designed bi-directional cellular booster, which utilizes both a transmit and a receive amplifier, the Call Capture/MOGO does not contain a transmit amplifier to boost the signal from the phone back to the cell site. The weak link in all cell systems is the low power from the phone to the cell site, whereas there is always more power available from the cell site to the phone. The Call Capture/MOGO, in its current form, is the equivalent of half a booster.

On CDMA systems, the amplified receive-only signal, supplied by the Call Capture/MOGO to the phone, tricks the phone into thinking that it is closer to the cell site than

it really is. When the phone thinks it is closer to the cell site, it reduces its output power to the cell site to conserve battery life, which results in no connection between the phone and cell site. In weak areas the Call Capture will cause both incoming and outgoing calls to be dropped. This could be disastrous in an emergency.

We at Wilson Electronics feel an obligation to alert the public to this fake and fraud, which can harm your cell phone's performance. Such a product hurts the public and is a detriment to public safety. It also conveys to the public the impression that all cellular signal amplifiers perform poorly and are of no value. We want consumers to know that cellular signal amplifiers work well when properly engineered.





**EXHIBIT**

D